UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INDEMNITY INSURANCE COMPANY
OF NORTH AMERICA *as subrogor of*
GE AVIATION MATERIALS, L.P.,

                                    Plaintiff,

                    -v-

EXPEDITORS INTERNATIONAL OF
WASHINGTON, INC., *et al.*,

                                    Defendants.

17-CV-2575 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Indemnity Insurance Company of North America ("Indemnity") brings this

action against Defendants Expeditors International of Washington, Inc. ("Expeditors") and China

Airlines, Inc. ("China Airlines"), in connection with damage allegedly sustained by cargo during

international transport.  Invoking the Convention for the Unification of Certain Rules for

International Carriage by Air, S. Treaty Doc. No. 106-45 (May 28, 1999) ("Montreal

Convention"), Indemnity asserts claims for breach of contract, breach of bailment obligations,

and negligence.  (Dkt. No. 1 ("Compl.") at 3–5.)  Following the close of discovery, each party

moved for summary judgment under Federal Rule of Civil Procedure 56.  (Dkt. Nos. 30, 35, 40.)

For the reasons that follow, the motions are denied.

I.      **Background**

The following facts are drawn from the Complaint and the parties' Rule 56.1 statements

and are not subject to genuine dispute unless otherwise noted.

This case involves an insurance company's attempt to recover for damage allegedly

sustained by a commercial jet engine as it was transported by air from Florida to Taiwan.  GE

Aviation Materials, L.P. ("GE") is an aviation company that assembles, sells, and overhauls

aircraft engines.  (Dkt. No. 36 ¶ 5.)  GE owned the jet engine at issue at the time of transport.

Plaintiff Indemnity is an insurance company that insures GE and issued a policy covering the

engine.  (Dkt. No. 36 ¶ 4.)

Defendant Expeditors is an "international transportation service provider" which

"operates as an intermediary in all modes of transportation."  (Dkt. No. 36 ¶ 2.)  As relevant

here, Expeditors' services include functioning as an "indirect air carrier," also known as an "air

freight forwarder."  (Dkt. No. 36 ¶ 1.)  In that capacity, Expeditors is party to a framework

agreement called the Global Air Freight Transportation Contract ("Global Contract"), which

governs the air shipment of cargo that Expeditors undertakes for certain shippers.  (Dkt. No. 51

¶ 6; Dkt. No. 39-1.)[1]  Expeditors also maintains a "Conditions of Contract" for "International Air

Transportation."  (Dkt. No. 52-2.)

Defendant China Airlines is a "foreign air carrier," which operates as a "direct air

carrier."  (Dkt. No. 36 ¶ 3.)  As a direct carrier, China Airlines is hired by shippers and indirect

carriers to transport cargo internationally.

In March 2015, GE reached out to Expeditors to arrange transport of a commercial jet

engine from Tamarac, Florida, to Taipei, Taiwan, to be delivered to Evergreen Aviation

Technologies ("Evergreen").  (Dkt. No. 34-2 at 8–9.)  In approving Expeditors' proposed price

for the transport, GE's Material Control and Logistics Manager, Jerry Yen, instructed that "[i]t's

very important to make sure the engine is under correct tie-down throughout the entire trip."

---

[1]     Expeditors contends that the GE and Expeditors are parties to the Global
Contract.  (Dkt. No. 51 ¶ 6; Dkt. No. 39 ¶ 3.)  GE disputes this allegation, contending that "GE
Aviation Materials, L.P. is not a party to that agreement."  (Dkt. No. 51 ¶ 6.)  In her deposition,
when asked about any "any written agreements between Expeditors and GE," Expeditors'
regional account manager for GE, Jennifer Schmitt, referenced Expeditors' "air contract," but
did not clarify whether she meant the Global Contract, the Conditions of Contract, or something
else.  (Dkt. No. 34-3 at 9:8–10:2.)

(Dkt. No. 34-2 at 6; *see* Dkt. No. 32 ¶ 1.)  Expeditors' regional account manager for GE, Jennifer

Schmitt, responded "well noted on the tie down."  (Dkt. No. 34-2 at 5; Dkt. No. 34-3 at 6.)

Schmitt did not ask Yen for any clarification regarding the proper tie-down procedures, and Yen

offered no specific instructions.  (Dkt. No. 34-3 at 20:19–20:21.)

 Expeditors issued an air waybill to GE in connection with the arrangement, and the

waybill did not specify any special transit requirements for the engine.  (Dkt. No. 36 ¶ 15; Dkt.

No. 34-7.)  On April 8, 2015, Expeditors arranged to have China Airlines transport the jet engine

cargo (Dkt. No. 36 ¶ 15; Dkt. No. 40-1 ¶ 2), but in doing so did not provide "any specific loading

and stowage instructions" to China Airlines (Dkt. No. 39 ¶ 5).  An air waybill was issued

between China Airlines and Expeditors in connection with this agreement.  (Dkt. No. 31 ¶ 11;

Dkt. No. 34-8.)

 The parties agree that the engine at issue was used and was being sent to Evergreen for an

overhaul.  (Dkt. No. 36 ¶¶ 10–11; Dkt. No. 38-1 at 27:4–10.)  But they dispute the precise

condition of the engine at the time China Airlines picked it up for transport, specifically whether

the engine was certified airworthy.[2]

 Between April 8 and April 11, 2015, China Airlines transported the engine from Florida

to Taiwan.  (Dkt. No. 40-1 ¶¶ 3–4.)  The second air waybill was stamped, acknowledging

---

[2] Indemnity relies on an "airworthiness approval tag" for the engine dated
December 26, 2014, and a letter from the entity storing the engine for GE in Florida regarding
the engine's "preservation state" to conclude that the engine was certified airworthy at the time
of shipment.  (Dkt. No. 51 ¶¶ 12, 14; Dkt. No. 31 ¶¶ 1, 9; Dkt. No. 34-6.)  Expeditors contends
that those documents are unauthenticated hearsay and do not demonstrate the airworthiness of
the engine.  (Dkt. No. 41-1 ¶¶ 1, 9.)  Instead, Expeditors relies on the testimony of Scott Wallace,
GE's Rule 30(b)(6) deponent, who agreed that the fact "that GE shipped this engine to Evergreen
Technologies to be overhauled demonstrates that the engine had not yet been certified and
needed work before it could be used by an airline."  (Dkt. No. 52-4 at 36:20–37:1; Dkt. No. 51
¶ 14.)

delivery of the engine, on April 11, 2015.  (Dkt. No. 36 ¶ 32; Dkt. No. 39-4.)  Upon receipt of

the engine, Evergreen created a shop finding report documenting that it "found inappropriate tie

down on the cradle" of the engine.  (Dkt. No. 34-9 at 2; *see also* Dkt. No. 31 ¶ 12.)  Evergreen

sent GE a shop finding report to this effect,[3] and told GE that it proposed to perform repairs.

(Dkt. No. 34-11 at 3.)  Evergreen inspected the engine and performed repairs, including

replacing bearings.  (Dkt. No. 51 ¶ 20; Dkt. No. 38-1 at 92:15–21.)[4]

Evergreen sent GE an invoice for service to the engine in the amount of $176,066.57.

(Dkt. No. 31 ¶ 16; Dkt. No. 34-12.)[5]  GE paid the invoice, and Indemnity compensated GE for

the payment.  (Dkt. No. 31 ¶ 17; Dkt. No. 41-1 ¶ 17; Dkt. No. 34-13.)

On April 16, 2015, Jerry Yen from GE forwarded Evergreen's shop finding report to

Jennifer Schmitt and another Expeditors employee, informing them of the "inappropriate tie

down" and that GE would "hold Expeditors response [*sic*] for" the cost of repairs.  (Dkt. No. 31

¶¶ 12–13; Dkt. No. 34-11 at 2.)  On April 17, Schmitt responded to Yen, "We will handle via the

cargo claims group. Please let me know if you need information on how to handle."  (Dkt. No.

34-11 at 2; *see also* Dkt. No. 31 ¶ 15.)  On June 14, 2015, Yen emailed Schmitt with an invoice

for the repairs to the engine.  (Dkt. No. 34-11 at 1.)  Schmitt forwarded the invoice to GE's Scott

---

[3]     Expeditors disputes that Evergreen found the engine to have been improperly tied
down, and contends that the shop finding report from Evergreen is "hearsay and otherwise
unsupported by cognizable evidence."  (Dkt. No. 41-1 ¶ 12.)

[4]     The parties dispute whether the engine suffered damage during transit, and
whether bearings were replaced because they were damaged, or as a preventative measure.  (Dkt.
No. 51 ¶¶ 18–20.)

[5]     The parties dispute whether the total amount of this invoice pertains to the work
required to fix damage suffered during shipment, or whether it covers only the work Evergreen
was "hired and shipped [the engine] to undertake in the first place."  (Dkt. No. 51 ¶ 19; *see* Dkt.
No. 31 ¶ 18; Dkt. No. 41-1 ¶ 18.)

Wallace on July 9, 2015, stating that she did not "think a claim has been filed" for this engine. (Dkt. No. 34-11 at 1.)

In April 2016, a third-party claims consultant contacted Expeditors' claims department on behalf of GE and Indemnity, seeking to recover for the damage to the engine. (Dkt. No. 43-1 at 1–2.) Expeditors ultimately rejected GE's attempts to recover through its internal claims process. (Dkt. No. 52-1.)

On April 10, 2017, acting as the subrogee for GE, Indemnity initiated this action against Expeditors and China Airlines. (Dkt. No. 1.) In its Answer to the Complaint, Expeditors asserted a crossclaim against China Airlines seeking contribution or indemnification to the extent of Expeditors' liability. (Dkt. No. 9 at 5.) On March 23, 2018, Indemnity filed a motion for summary judgment under Rule 56. (Dkt. No. 30.) The following day, Expeditors and China Airlines moved for summary judgment as well. (Dkt. Nos. 35 & 40.)

## II.    Legal Standard

Summary judgment under Rule 56 is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue

for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014). The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting *Lunds, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)) (internal quotation marks omitted).

## III. Discussion

### A. Jurisdiction

"Federal courts have a duty to inquire into their subject matter jurisdiction sua sponte, even when the parties do not contest the issue." *D'Amico Dry Ltd. v. Primera Maritime (Hellas) Ltd.*, 756 F.3d 151, 161 (2d Cir. 2014). If a court determines that it lacks subject matter jurisdiction, it must dismiss the action under Federal Rule of Civil Procedure 12(h)(3). Inquiring into its jurisdiction here, the Court concludes that the Montreal Convention does not govern this dispute, and thus Indemnity cannot establish federal question jurisdiction as alleged in the Complaint. However, because the action satisfies the requirements for diversity jurisdiction, dismissal under Rule 12(h)(3) is not warranted.

#### 1. Applicability of the Montreal Convention

Indemnity asserts in the Complaint that jurisdiction exists under 28 U.S.C. § 1331, because the claims arise under the Montreal Convention,[6] a multilateral treaty governing international air transport, to which the United States is a party. (Compl. ¶ 8.) China Airlines

---

[6] Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106-45, ICAO Doc. No. 9740 (entered into force Nov. 4, 2003).

disagrees, contending that the Montreal Convention does not govern this dispute. (Dkt. No. 46 at 3–4; Dkt. No. 40-2 at 3–4.)[7]

The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed by aircraft." Montreal Convention, art. 1 ¶ 1. "International carriage" is defined as "any carriage in which . . . the place of departure and the place of destination, whether or not there be a break in the carriage or a transhipment, are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State." *Id*. art. 1 ¶ 2.

The United States is a party to the Montreal Convention, as is China. (*See* Dkt. No. 52-6.)[8] But Taiwan is not itself a signatory. Indemnity contends that Taiwan is nonetheless a party to the Montreal Convention, however, because the People's Republic of China constitutes the recognized government of all of China—including Taiwan—and China's ratification of the treaty means that the treaty also binds Taiwan. (Dkt. No. 54 at 2–4; Dkt. No. 55 at 8–10.) The Court disagrees.

The Ninth Circuit considered a nearly identical question in *Mingtai Fire & Marine Insurance Co. v. United Parcel Service*, 177 F.3d 1142 (9th Cir. 1999): whether China's status as a signatory to the Warsaw Convention meant that international shipments to and from Taiwan are governed by the treaty, even though Taiwan itself was not a signatory. *Id*. at 1144.[9] The

---

[7]     Expeditors agrees with Indemnity that this action is governed by the Montreal Convention (Dkt. No. 37 at 14), but asserts that its arguments apply regardless of the Convention's applicability (Dkt. No. 41 at 2 n.1).

[8]     Also available at ICAO, Current List of Parties to Multilateral Air Law Treaties, *Convention for the Unification of Certain Rules for International Carriage by Air*, Doc. 9740, https://www.icao.int/secretariat/legal/List%20of%20Parties/Mtl99_EN.pdf.

[9]     The Warsaw Convention, Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876

Ninth Circuit reasoned that "the question of Taiwan's status . . . is a question for the political branches, rather than the judiciary." *Id*. The court's task was thus to determine and apply the position of the political branches.

To do so, the Ninth Circuit looked to the President's memorandum regarding the termination of diplomatic relations with Taiwan, and Congress's enactment of the Taiwan Relations Act, 22 U.S.C. § 3301 et seq., which "strongly imply that, despite the absence of official relations, the United States continues to deal separately with Taiwan." *Id*. at 1145–46. The court also relied on the State Department's *Treaties in Force*, which includes "separate sections listing the bilateral treaties" that the United States has with China and Taiwan, respectively. *Id*. at 1146. And significantly, the Executive filed an amicus brief in that case making "plain its position that China's adherence to the Convention does not bind Taiwan." *Id*. Ultimately, the Ninth Circuit "defer[red] to the political departments' position that Taiwan is not bound by China's adherence to the Warsaw Convention." *Id*. at 1147.

A court in the Eastern District of New York recently addressed the same question raised in *Mingtai Fire*, and found "persuasive the Ninth Circuit's thorough discussion and explanation of why Taiwan is not bound by the Warsaw Convention." *Allianz Glob. Risks US Ins. Co. v. Latam Cargo USA, LLC*, No. 16 Civ. 6217, 2018 WL 1701941, at *5 (E.D.N.Y. Mar. 31, 2018). Noting "no reason to believe that the Executive Branch has changed its position that Taiwan is not bound by China's accession to the Warsaw Convention," the court held that "Taiwan is not bound by the Warsaw Convention." *Id*.

―――――――――――――

(entered into force in 1934), is the predecessor to the Montreal Convention, with "many of the provisions of the Montreal Convention [having been] taken directly from the Warsaw Convention and the many amendments thereto," *Indem. Ins. Co. of N. Am. v. Agility Logistics Corp.*, 324 F. Supp. 3d 400, 403 (S.D.N.Y. 2018) (citation omitted).

This Court also considers the Ninth Circuit's reasoning in *Mingtai Fire* to be thorough and persuasive. But Indemnity opposes the application of *Mingtai Fire* here, contending that the Ninth Circuit issued that decision "19 years ago" about "a different treaty," whereas the "different times and circumstances" of this case require a different result. (Dkt. No. 54 at 2–3.)

Indemnity asserts that since *Mingtai Fire* was decided, the State Department "has expressly recognized that Taiwan is part of China." (Dkt. No. 54 at 2.) But Indemnity cites no authority for the proposition that the Executive has changed its position vis-à-vis China, Taiwan, and their treaty obligations, since 1999.[10] Indeed, the court in *Allianz* observed "no reason to believe that the Executive Branch has changed its position" from 1999 to 2018. *See Allianz*, 2018 WL 1701941, at *5. This Court agrees that the age of the *Mingtai Fire* decision does not undermine its persuasiveness.

Indemnity also points out that the Montreal Convention is a different treaty, which China signed after the *Mingtai Fire* decision. (Dkt. No. 54 at 3.) This distinction is inapposite, however, because the Ninth Circuit's reasoning applies equally to any treaty in which China is a signatory but Taiwan is not, where the political branches have provided no treaty-specific guidance requiring a different result. Moreover, Indemnity cites only one case as having reached the result it urges under the Montreal Convention. (Dkt. No. 54 at 1.) But there, the court merely adopted the parties' framing of their dispute without addressing the question of whether the Montreal Convention applies to Taiwan. *See Bland v. EVA Airways Corp.*, No. 11 Civ. 5200, 2014 WL 1224466, at *1 (S.D.N.Y. Mar. 24, 2014).

---

[10] To the extent Indemnity attempts to rely on the newest version of *Treaties in Force* to imply that the Executive's position has changed since its amicus brief in *Mingtai* (Dkt. No. 54 at 2–3), China Airlines is correct that *Treaties in Force* used the same language to describe the treatment of Taiwan in the publication's 1993 edition, before *Mingtai* was decided. (Dkt. No. 58 at 3; *see* Dkt. No. 57-1 at 3.)

Ultimately, the Court is unconvinced by Indemnity's efforts to distinguish *Mingtai Fire*. Applying the Ninth Circuit's reasoning in that case, the Court concludes that Taiwan is not bound by the Montreal Convention. Because this case involves transport of cargo to Taiwan—a non-party state—the shipment does not qualify as "international carriage" under Article 1, paragraph 2 of the Montreal Convention. Therefore, the Montreal Convention does not govern this dispute, and the Court does not have subject matter jurisdiction over this action as "arising under the . . . treaties of the United States." 18 U.S.C. § 1331.

### 2. Diversity Jurisdiction

Noting the possibility that this case did not arise under a treaty, the Court directed the parties to file supplemental submissions addressing a potential alternative basis for subject matter jurisdiction. (Dkt. No. 60.) On January 22, 2019, the parties filed a joint response, indicating their agreement "that federal diversity jurisdiction is a basis for jurisdiction in this Court under 28 U.S.C. § 1332," because "[t]he parties do not have any citizenship in common, and the amount in controversy exceeds $75,000." (Dkt. No. 61.)

As alleged in the Complaint, Indemnity is a corporation organized under the laws of Pennsylvania with a principal place of business in Philadelphia, Pennsylvania. (Compl. ¶ 2.) Expeditors is a corporation organized under the laws of Washington with a principal place of business in Seattle, Washington. (Compl. ¶ 4.) China Airlines is a foreign corporation organized under the laws of Taiwan, with a principal place of business in Taoyuan, Taiwan. (Compl. ¶ 6.) And the amount in controversy exceeds $75,000. (Compl. at 6.)

The Court thus concludes that the parties are completely diverse and the amount in controversy requirement is satisfied. As such, the Court possesses subject matter jurisdiction over this action under 28 U.S.C. § 1332.

### B. Indemnity's Motion for Summary Judgment

Indemnity asserts three claims against the Defendants: (1) breach of contract of carriage, (2) breach of bailment obligations, and (3) negligence. (Compl. ¶¶ 9–23.) In arguing in favor of summary judgment on these claims, Indemnity relies on the provisions of, and case law developed under, the Montreal Convention. (Dkt. No. 33 at 5–7; Dkt. No. 55 at 2, 10–12.) As the Court has explained, however, the Montreal Convention does not govern this dispute. Accordingly, the Court will deny Indemnity's motion for summary judgment without prejudice, should Indemnity choose to seek summary judgment again under the applicable substantive law.

### C. Expeditors' Motion for Summary Judgment

In moving for summary judgment, Expeditors argued that: (1) GE did not comply with contractual notice requirements for its claim against Expeditors; (2) Indemnity has not established a *prima facie* case of cargo damage; and (3) GE's own wrongdoing and inherent flaws in its cargo caused the damage. (Dkt. No. 37 at 14–20; Dkt. No. 41 at 2–14; Dkt. No. 56 at 1–10.) The second and third of these arguments are based on substantive law furnished by the Montreal Convention, which the Court has determined does not govern this dispute. Therefore, Expeditors' motion for summary judgment is denied to the extent it relies on those arguments, again without prejudice to refiling under the applicable substantive law.

By contrast, Expeditors' first argument relies on contracts between the parties, independent of the substantive law underlying Indemnity's claims. Therefore, the Court will address this basis for summary judgment.

In asserting that Indemnity is contractually barred from recovery in this action, Expeditors relies on the Global Air Freight Transportation Contract ("Global Contract"). The Global Contract provides in relevant part:

> Forwarder will not be liable for any act, omission or default in connection with the Services unless a preliminary notice of claim is presented within fourteen (14) days from date of Service and a formal claim is presented within two hundred seventy (270) days from the date of Service. Claims must be written, with a sworn proof of claim attached and received at Forwarder's corporate office.

(Dkt. No. 39-1 ¶ 7.B.)  Expeditors contends that GE failed to file a timely formal claim in accordance with the Global Contract, and thus any recovery from damage to the shipment at issue is barred.  (Dkt. No. 37 at 16.)

Indemnity's main response to this argument is that the Global Contract is not "part of the contracts of carriage for the shipment at issue."  (Dkt. No. 53 at 5.)[11]  According to Indemnity, the specific subrogor here—GE Aviation Materials—did not sign the Global Contract.  (Dkt. No. 53 at 7 n.10; Dkt. No. 51 ¶ 6 (response).)  Indeed, nowhere in the limited excerpts that are before the Court does the Global Contract name GE Aviation Materials as a party to the agreement. (*See* Dkt. Nos. 39-1 & 52-3.)

Indemnity also points to the course of prior dealings between Expeditors and GE to support its position that the Global Contract does not apply, because the parties never adhered to the Global Contract's formal claim requirements.  (Dkt. No. 53 at 9.)  GE's Scott Wallace testified that over four years he handled approximately thirty to thirty-five claims for GE against Expeditors, which under certain circumstances he handled by sending a preliminary notice of claim to Jennifer Schmitt.  (Dkt. No. 52-4 at 139:2–140:7; *see also* Dkt. No. 38-1 at 127:5–9,

---

[11]     Indemnity also briefly contends that (1) the Montreal Convention does not permit carriers to impose additional contractual restrictions like the notice and claim requirements in the Global Contract, and (2) even if the Global Contract applies, GE has satisfied its requirements. (Dkt. No. 53 at 8–9.)  Because the Montreal Convention does not apply to this dispute, and questions regarding the applicability of the Global Contract require denying Expeditors' motion for summary judgment, the Court need not address these arguments.

134:10–16.)[12]  He further testified that he had "never had a claim where anybody did any sworn statements."  (Dkt. No. 38-1 at 127:10–16; *see* Dkt. No. 34-10 (examples of emails initiating claims without sworn statement).)

Expeditors responds by purporting to quote from sections 1.A and 2.C of the Global Contract to demonstrate that General Electric Company and its affiliates are parties to the contract, and to show that the Global Contract applies to all General Electric shipments handled by Expeditors.  (Dkt. No. 56 at 3 n.3.)  In doing so, however, Expeditors relies on portions of the Global Contract that were not filed with the Court.  Expeditors also contends that Indemnity, in arguing that the Global Contract does not apply, is taking a position inconsistent with its position prior to this litigation and during discovery.  (Dkt. No. 56 at 3.)  Again, however, the documents Expeditors cites—initial disclosures, responses to interrogatories, page 121 of Scott Wallace's deposition, and section 21.A of the Global Contract—are not in the record.   (*See* Dkt. Nos. 38-1 42-1, 52-4 (excerpts from Wallace Dep.).)

The Court concludes that there is a genuine dispute regarding whether the subrogor—GE Aviation Materials—was a party to the Global Contract, and whether the Global Contract independently applies to all shipments undertaken by Expeditors on behalf of GE Aviation Materials.  The Court has been given only three pages of the thirty-three-page Global Contract in the record.  (Dkt. Nos. 39-1 & 52-3.)  In this position, it is not possible to properly evaluate Expeditors' arguments, which rely on contractual provisions the Court is not able to review.[13]

---

[12]      In her deposition, Schmitt denied that she handled claims filed by customers for damage to cargo.  (Dkt. No. 34-3 at 8:19–8:21, 15:8–15:14; *see also* Dkt. No. 39 ¶ 12.)

[13]      In its reply brief, Expeditors acknowledges that the Court did not have the entire contract before it, and offered to file it under seal if necessary.  (Dkt. No. 56 at 3.)  However, the opportunity to adduce the entire contract as evidence—and have the Court consider the contract in its entirety in determining whether to grant the motion for summary judgment—has passed.

Even if GE Aviation Materials was not a party to the Global Contract, however, it could still be bound by terms of that agreement if they were incorporated into the air waybill or Expeditors' Conditions of Contract. *See Sotheby's v. Fed. Exp. Corp.*, 97 F. Supp. 2d 491, 500 (S.D.N.Y. 2000). Indemnity contends that it cannot be bound under this theory because the Global Contract was not incorporated into the applicable contracts of carriage: the air waybill and Expeditors' Conditions of Contract. (Dkt. No. 53 at 8–9.)[14] "A contract must clearly and accurately identify a document to effectively incorporate it by reference." *Sotheby's*, 97 F Supp. at 500. Here, neither the air waybill nor the Conditions of Contract refer to the Global Contract and its terms. (*See* Dkt. Nos. 34-7 & 52-2.)[15] Therefore, the Global Contract cannot be deemed to apply to the shipment at issue by incorporation.

Because there remains a genuine dispute regarding whether the Global Contract applies to the shipment at issue, Expeditors' motion for summary judgment on the ground that the Global Contract's claim requirements bar recovery is denied.[16]

---

The Court will evaluate the motions *sub judice* based on the record materials that have been filed in a timely manner and that the Court has before it.

[14] This argument relies on cases decided under the Montreal Convention. But those cases applied general principles of contract law in determining whether additional conditions of service were adequately incorporated by reference into an air waybill, and so the inapplicability of the Montreal Convention does not diminish the relevance of this argument. *See Meteor AG v. Fed. Exp. Corp.*, No. 08 Civ. 3773, 2009 WL 222329, at *6 (S.D.N.Y. Jan. 30, 2009), *vacated*, 2009 WL 3853802 (S.D.N.Y. Nov. 18, 2009); *Sotheby's*, 97 F. Supp. 2d at 500.

[15] The air waybill at issue states that "the goods described herein are accepted . . . for carriage SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERSE HEREOF." (Dkt. No. 34-7.) This presumably refers to Expeditors' Conditions of Contract document. (Dkt. No. 52-2.) However, none of the versions of the air waybill filed by the parties includes a copy of the reverse side of the air waybill. (*See* Dkt. Nos. 34-7, 39-2, 40-6.)

[16] If Expeditors elects to move for summary judgment again, as discussed above, it should base its motion on the change in applicable substantive law. Any new motion should not reargue contract-based issues on which the Court has denied summary judgment, except to the extent that those arguments are affected by the applicable substantive law.

**D.      China Airlines' Motion for Summary Judgment**

In the absence of the Montreal Convention, China Airlines contends that its Conditions of Carriage govern the dispute, and that summary judgment in its favor is warranted because the Conditions of Carriage required that it receive written notice of the claim within 14 days of receipt of cargo.  (Dkt. No. 40-2 at 3–5.)  All parties agree that China Airlines was not given notice of a claim of damage to the shipment at issue by Indemnity or Expeditors within the requisite time period.  (Dkt. No. 40-4 at 2–3; Dkt. No. 44-1 ¶ 5.)  As a result of its not having received a timely notice of claim directly, China Airlines contends, "no recovery can be obtained against [it] pursuant to the Conditions of Carriage."  (Dkt. No. 40-2 at 5.)

Indemnity does not directly respond to this argument, instead maintaining that the Montreal Convention applies and contending that the Montreal Convention enables notice to the indirect carrier to suffice for the direct carrier.  (Dkt. No. 54 at 4–6.)  Although this contract-based argument in China Airlines' "motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004).

China Airlines' Contract of Carriage provides in relevant part that:

> 10.      Receipt by the person entitled to delivery of the cargo without complaint shall be prima facie evidence that the cargo has been delivered in good condition and in accordance with the contract of carriage.
> 10.1      In the case of loss of, damage or delay to cargo a written complaint must be made to Carrier by the person entitled to delivery.  Such complaint must be made:
> 10.1.1  in the case of damage to the cargo, immediately after discov-ery [sic] of the damage and at the latest within 14 days from the date of receipt of the cargo[.]

(Dkt. No. 40-8 ¶¶ 10–10.1.1.)  The Court observes, however, that the copies of China Airlines' Contract of Carriage before the Court appear to omit some of the provisions between paragraphs 10.1.1 and 10.5.  (*See* Dkt No. 40-8 at 3–4; Dkt. No. 48-1 at 3–4.)  This is a crucial section of the

contract, because it discusses the claim requirements that China Airlines seeks to rely on to bar recovery. Indeed, China Airlines cites a missing paragraph from the contract—¶ 10.2—for support in its briefs. (Dkt. No. 40-2 at 5; Dkt. No. 46 at 4; Dkt. No. 58 at 4.)

The omission is troubling in light of the significance of what language might be missing. The Contract of Carriage filed by China Airlines appears to consist of printouts from a webpage where the contract is published. (Dkt. Nos. 40-8 & 48-1.) Following the web address listed on those documents produces a webpage containing China Airlines' Contract of Carriage.[17] The Court will take judicial notice of this webpage *sua sponte* under Federal Rule of Evidence 201(b)(2) as containing China Airlines' Contract of Carriage as of January 2019. The nature of this document can be "accurately and readily determined," Fed. R. Evid. 201(b)(2), in light of its presence on China Airlines' official website, its existence at the web address listed on the Contract of Carriage filed by China Airlines in this action, and its similarity in appearance and content to those documents. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) ("[A] court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." (internal quotation marks omitted)).

Based on an examination of the current version of China Airlines' Contract of Carriage, several of the provisions omitted from the contracts in the record appear to be highly relevant. They provide in part:

> 10.2    Such complaint may be made to the Carrier whose air waybill was used, or to the first Carrier or to the last Carrier or to the Carrier, which performed the carriage during which the loss, damage or delay took place.

---

[17]    China Airlines Cargo, *Contract of Carriage*, https://cargo.china-airlines.com/ccnetv2/content/services/ContractOfCarriage.aspx (visited Jan. 13, 2019) ("January 2019 Contract of Carriage"). This webpage is reproduced as Appendix A to this opinion.

> 10.3    Unless a written complaint is made within the time limits specified in 10.1 no action may be brought against Carrier.

January 2019 Contract of Carriage at ¶¶ 10.2–10.3.  Paragraph 10.3, which contains the provision of the contract that operates to bar actions against China Airlines in the event of an untimely claim, does not appear in the versions of the Contract of Carriage that China Airlines filed.  (*See* Dkt. Nos. 40-8 & 48-1.)  Without a similar contractual provision in the record indicating that an untimely notice of claim is an absolute bar to recovery, China Airlines has not established that the untimely notice of claim here entitles it to judgment as a matter of law.

Additionally, paragraph 10.2 specifies to whom a complaint may be made—the subject of the dispute between China Airlines and Indemnity in this case.  But this crucial provision is also not in the versions of the Contract of Carriage that China Airlines filed.  (*See id.*)  If the Contract of Carriage in force in April 2015 contains such a provision that applies to this dispute, it would appear that the timeliness requirement for a notice of claim was satisfied.  Complaints "may be made to the Carrier whose air waybill was used," January 2019 Contract of Carriage ¶ 10.2, and here the parties used air waybills issued by the indirect carrier: Expeditor (Dkt. Nos. 34-8 & 40-7).  And Expeditors received written notice of the claim on April 16, 2015—approximately a week after delivery—via Jerry Yen's email.  (Dkt. No. 31 ¶¶ 12–13; Dkt. No. 34-11 at 2.)

The Court is aware that the version of the Contract of Carriage of which it has taken judicial notice—that in force on January 13, 2019—may differ from the version in force in April 2015, which governs the shipment at issue.  But the provisions in the current contract that correspond to the provisions omitted from the contracts in the record throw into relief the potential significance of the missing language.

Without the ability to review the entirety of China Airlines' Contract of Carriage in force at the time of the shipment, the Court cannot conclude that China Airlines is entitled to judgment

as a matter of law.  As such, China Airlines' motion for summary judgment is denied.  However, because the other parties may file new motions for summary judgment, and Indemnity did not properly respond to China Airlines' contract-based arguments in this first round of briefing, China Airlines may also file a new motion for summary judgment.

**IV.  Conclusion**

For the foregoing reasons, Indemnity's motion for summary judgment is DENIED, Expeditor's motion for summary judgment is DENIED, and China Airlines' motion for summary judgment is DENIED.

In light of the Court's conclusion that the Montreal Convention does not govern this dispute, the parties may file new motions for summary judgment based on the applicable substantive law.  Any new motions should follow a sequential briefing schedule:  first, Indemnity should file a motion and supporting brief by April 3, 2019; followed by Defendants' motions and briefs jointly supporting their motions and opposing Indemnity's motion; followed by Indemnity's opposition and reply brief; followed by Defendants' reply briefs.

The parties are directed to confer and submit a joint letter by March 13, 2019 regarding whether there will be additional motions for summary judgment, and if so the full briefing schedule thereof; if no such motions are anticipated, the letter should estimate the length of trial and propose trial dates.

The Clerk of Court is directed to close the motions at Docket Numbers 30, 35, and 40.

SO ORDERED.

Dated: February 19, 2019
       New York, New York

_____
              J. PAUL OETKEN
           United States District Judge

18

# Appendix A





Home  >  Services  >  Contract of Carriage

# Contract of Carriage

Server :L1  0.02s

13Jan 18:55:33(z)

<u>General Conditions of Carriage for Cargo</u>

## Notice Concerning Carriers' Limitation Of Liability

If the carriage involves an ultimate destination or stop in a country other than the country of departure, the Warsaw Convention or the Montreal Convention may be applicable to limit the liability of the Carrier in respect of loss, damage or delay to cargo. Carrier's limitation of liability is as set out in subparagraph 4 unless a higher value is declared and a supplementary charge is paid.

## Conditions Of Contract

1.  In this contract and the Notices appearing hereon: CARRIER includes the air carrier issuing this air waybill and all carriers that carry or undertake to carry the cargo or perform any other services related to such carriage. SPECIAL DRAWING RIGHT (SDR) is a Special Drawing Right as defined by the International Monetary Fund. WARSAW CONVENTION means whichever of the following instruments is applicable to the contract of carriage: the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw, 12 October 1929; that Convention as amended at The Hague on 28 September 1955; that Convention as amended at The Hague 1955 and by Montreal Protocol No. 1, 2, or 4 (1975) as the case may be.MONTREAL CONVENTION means the Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal on 28 May 1999.

2.1  Carriage is subject to the rules relating to liability established by the Warsaw Convention or the Montreal Convention unless such carriage is not "international carriage" as defined by the applicable Conven- tions.

2.2  To the extent not in conflict with the foregoing, carriage and other related services performed by each Carrier are subject to:

2.2.1  applicable laws and government regulations;

2.2.2  provisions contained in the air waybill, Carrier's conditions of carriage and related rules, regulations, and timetables(but not the times of departure and arrival stated therein) and applicable tariffs of such Carrier, which are made part hereof, and which may be inspected at any airports or other cargo sales offices from which it operates regular services.When carriage is to/from the USA, the shipper and the consignee are entitled, upon request, to receive a free copy of the Carrier's conditions of carriage.The Carrier's conditions of carriage include, but are not limited to:

2.2.2.1  limits on the Carrier's liability for loss, damage or delay of goods, including fragile or perishable goods;

2.2.2.2  claims restrictions, including time periods within which shippers or consignees must file a claim or bring an action against the Carrier for its acts or omissions, or those of its agents;

2.2.2.3  rights, if any, of the Carrier to change the terms of the contract;

2.2.2.4  rules about Carrier's right to refuse to carry;

2.2.2.5  rights of the Carrier and limitations concerning delay or failure to perform service, including schedule changes,

3.  The agreed stopping places(which may be altered by Carrier in case of necessity) are those places, except the place of departure and place of destination, set forth on the face hereof or shown in Carrier's timetables as scheduled stopping places for the route.Carriage to be performed hereunder by several successive Carriers is regarded as a single operation.

4.  For carriage to which the Montreal Convention does not apply, Carrier's liability limitation for cargo lost, damaged or delayed shall be 19 SDRs per kilogram unless a greater per kilogram monetary limit is provided in any applicable Convention, or in Carrier's tariffs or general conditions of carriage.

5.1 Except when the Carrier has extended credit to the consignee without the written consent of the shipper, the shipper guarantees payment of all charges for the carriage due in accordance with Carrier's tariff, conditions of carriage and related regulations, applicable laws(including national laws implementing the Warsaw Convention and the Montreal Convention), government regulations, orders and requirements.

5.2 When no part of the consignment is delivered, a claim with respect to such consignment will be considered even though transportation charges thereon are unpaid.

6.1 For cargo accepted for carriage, the Warsaw Convention and the Montreal Convention permit shipper to increase the limitation of liability by declaring a higher value for carriage and paying a supple- mental charge if required.

6.2 In carriage to which neither the Warsaw Convention nor the Montreal Convention applies Carrier shall, in accordance with the procedures set forth in its general conditions of carriage and applicable tariffs, permit shipper to increase the limitation of liability by declaring a higher value for carriage and paying a supplemental charge if so required.

7.1 In cases of loss of, damage or delay to part of the cargo, the weight to be taken into account in determining Carrier's limit of liability shall be only the weight of the package or packages concerned.

7.2 Notwithstanding any other provisions, for "foreign air transportation" as defined by the U.S.Transportation Code:

    7.2.1 in the case of loss of, damage or delay to a shipment, the weight to be used in determining Carrier's limit of liability shall be the weight which is used to determine the charge for carriage of such shipment; and

    7.2.2 in the case of loss of, damage or delay to a part of a shipment, the shipment weight in 7.2.1 shall be prorated to the packages covered by the same air waybill whose value is affected by the loss, damage or delay.The weight applicable in the case of loss or damage to one or more articles in a package shall be the weight of the entire package.

8. Any exclusion or limitation of liability applicable to Carrier shall apply to Carrier's agents, employees, and representatives and to any person whose aircraft or equipment is used by Carrier for carriage and such person's agents, employees and representatives.

9. Carrier undertakes to complete the carriage with reasonable dispatch.Where permitted by applicable laws, tariffs and govern- ment regulations, Carrier may use alternative carriers, aircraft or modes of transport without notice but with due regard to the interests of the shipper.Carrier is authorized by the shipper to select the routing and all intermediate stopping places that it deems appropriate or to change or deviate from the routing shown on the face hereof.

10. Receipt by the person entitled to delivery of the cargo without complaint shall be prima facie evidence that the cargo has been delivered in good condition and in accordance with the contract of carriage.

10.1 In the case of loss of, damage or delay to cargo a written complaint must be made to Carrier by the person entitled to delivery.Such complaint must be made:

    10.1.1 in the case of damage to the cargo, immediately after discov- ery of the damage and at the latest within 14 days from the date of receipt of the cargo;

    10.1.2 in the case of delay, within 21 days from the date on which the cargo was placed at the disposal of the person entitled to delivery.

    10.1.3 in the case of non-delivery of the cargo, within 120 days from the date of issue of the air waybill, or if an air waybill has not been issued, within 120 days from the date of receipt of the cargo for transportation by the Carrier.

10.2 Such complaint may be made to the Carrier whose air waybill was used, or to the first Carrier or to the last Carrier or to the Carrier, which performed the carriage during which the loss, damage or delay took place.

10.3 Unless a written complaint is made within the time limits specified in 10.1 no action may be brought against Carrier.

10.4 Any rights to damages against Carrier shall be extinguished unless an action is brought within two years, whereas in the Taiwan Region, one year, from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the carriage stopped.

10.5 Carrier shall not be liable for any indirect, incidental, consequential, punitive or special damages, including, without limitation, lost profits, lost sales, lost prospective economic advantage, or any costs, arising out of or in connection with any performance or failure to perform the carriage, even if Carrier knew or should have known of the existence of such damages.

11. Shipper shall comply with all applicable laws and government regula- tions of any country to or from which the cargo may be carried, including those relating to the packing, carriage or delivery of the cargo, and shall furnish such information and attach such documents to the air waybill as may be necessary to comply with such laws and regulations.Carrier is not liable to shipper and shipper shall indem- nify Carrier for loss or expense due to shipper's failure to comply with this provision.

12. No agent, employee or representative of Carrier has authority to alter, modify or waive any provisions of this contract.

13. Either overcharge claimed by shipper, or charge shortage debited by the Carrier must be made in writing within two years from the date of issue of the Air Waybill.


Back to Top

**Shipping Tools & Information**
Registration
Shipment Tracking
Flight Status
Schedule Display
Loadability
Shoring Calculation

**Products**
Express
Customized
Specialized
General

**Services**
Dangerous Goods
Live Animals
Cool Chain
Contract of Carriage
Advance Cargo Information
Mobile Service

**About CAL Cargo**
News
Fuel Surcharge
Our Company
Our Fleet
Our Network
Our Office
Unit Load Devices
Information Security
Policy

**Customer Support**
FAQs
Pre-claim

© 2016 China Airlines

Mobile Site   Site Map   Legal   China Airlines   SkyTeam Cargo